State my appreciation for you willing to make that concession I don't know whether it was right or wrong, but I admire your willingness to step up and make one. Thank you Mr. Bunch, are you ready? Wilbert Henson's constitutional rights were violated because he did not receive adequate health care for his serious medical conditions while he was incarcerated in the Wichita County Jail. Ten years ago, the ladies in the back of the courtroom came to my home where I officed and asked me to give them some direction on what to do about their father dying in the jail. The problem with people dying in the jail is that the people trying to find out what went on are on the outside and only the people in the jail house are on the inside. So I immediately had noticed the county that we wanted to preserve all the evidence that they had, including videotapes, which they had of in-house security. Mr. Henson spent six days in jail. He came to jail. He had just been released from the hospital for pneumonia, hypertension. My colleagues may disagree, but I don't think we need to go over all these facts. I think we're pretty familiar with them, including Judge Southwick, who's written two opinions on this case. Again, I'm just the voice of one, but you ought to blend your facts into your legal issues. Judge Southwick laid out the facts pretty significantly in the Krocica case. We believe that the use of LVNs to practice medicine or to assist people without direction from a doctor or registered nurse is not only unconstitutional, but it's against the Texas Nurse Practice Act. They can't do that. Their training is limited and their abilities are limited. In this particular case, Krocica went to ask for blood pressure of Mr. Henson and came back with a 207 over 106, and that is hypertensive emergency. But she didn't know that. She didn't know that because she doesn't know what a normal blood pressure is. I asked her that in deposition. She couldn't identify it. Same way with Nurse George, who also saw it. Couldn't tell me what a normal range of blood pressure would be. Mr. Bunch, I'm sure you disagree with the rulings that the court has already made in this case, including the case dealing with Nurse Krocica. Looking at the case before us now, dealing with Dr. Boland and Wichita County itself, let's take Wichita County. Are you arguing that that is a conditions of confinement claim you have against Wichita County and an episodic act? Or what are you arguing as to Wichita County, and then would you jump into that and tell us why you are right? I believe this was not an episodic act by one or more officials. This was a situation where you involved 12 detention officers and four different nurses, and they were all trying to do something for this man. But they were limited because of the system they had in place. It's a multi-tiered system that was established and is a practice and custom in the Wichita County jail system. What's your best case that this is the condition, best precedent from this court or the Supreme Court? I would say Shepard. Okay, Shepard v. Dallas County. Dealing with the medical conditions there, what is the analogous? How would you line up . . . I mean, we've already found that Mr. Henson, despite the terrible outcome, did not have his constitutional rights violated by Nurse Kroshka or by the sheriff. And we never had the case dealing with Nurse George come to us. So taking those as resolved in this case, unless you have some challenge that they're really not, which I wouldn't necessarily recommend, how do we get to a conditions of confinement case where there was a constitutional violation? Mr. Henson spent a little over 135 hours in jail. His relationship with Nurse Kroshka was less than 10 minutes on the time that she went to visit him and then a 15-minute phone call the next day. That was it. Now, I agree with your decision that she tried to provide some care, so she was not deliberately indifferent. She was malpracticed and grossly negligent, but so were the other nurses that were involved in Mr. Henson's care, as well as the detention officers who knew that he was sick but had to defer to their policies and has to report it to a nurse on duty or on call. Nurse . . . I'm sorry. I interrupted you. I didn't mean to . . . All right. Have you finished your answer? Yes, sir. So you're arguing as to the county, you say practice and custom, but that falls more under conditions of confinement than episodic acts. So you're saying against the county, you're urging conditions of confinement? Yes, sir. All right. Tell me how you raised the issue of conditions of confinement in district court. How I raised it? Yes, sir. Did you preserve it? In our response to the motion for summary judgment with the county, document number 116-2, which somehow did not get raised or was not read by the district court in that motion because on the first page of his order, he's got everything listed, but he doesn't have our response listed. So it got overlooked by Judge O'Connor on the first motion for summary judgment. Where Judge O'Connor denied summary judgment. But he didn't look at our . . . or it appears that he didn't look at our pleading. And we listed out a laundry list of things, 16 items, and that's found in the response. And we pointed out such things as the intake was done. Mr. Henson should have never been allowed into the jail because at intake he was coughing. He had these problems he listed out. No, I'm asking about conditions of confinement, not episodic acts. You earlier said a practice in custom. I just want to know where we're going to find that in the record that you raised a conditions of confinement issue as to the county. 116-2. Document? Yes, sir. All right. So is it . . . your position is it wasn't an explicit policy saying nurses commit malpractice, but it was a de facto pervasive . . . is that the condition? Right. Well . . . And if that's the case, then do we have to look for the pervasive quality to whether you alleged that this occurred in circumstances other than his? Yes. Has it occurred in the Brown case? Has it occurred in this case, the Goldahart case? When you say, yes, we would have to make that pervasiveness finding, their argument is that the only other case that evidence was introduced arguably showing nurses being unsupervised is Brown, that the rest of them were not introduced. Right. The later cases that came along since Henson have shown that they continue to use LVNs unsupervised to conduct business like a doctor, practice medicine. They continue to do it, and there's no legitimate reason for them to do that. And, you know, this needs to be under the . . . if you look at it under the Bell-Kirk test, there's no legitimate purpose, governmental purpose, for them to use LVNs in a situation where they are not trained or educated on them. And the Nurse Practice Act has consistently said that these nurses are only allowed to take down information that are not to make decisions with regards to medical care or prescribing medications. That's a violation of state law. What evidence did you file in district court in support of your conditions of confinement issue state you raised? We had letters. We had affidavits from two nurses who talked about the condition, whereas the intimidation by the jail physician who wanted these nurses to make their decisions without his intervention. He didn't want to be called in late at night. He didn't want to know about the things that were going on in the jail. It was left up to the jail nurse to make the decision, and she's just an LVN. And they had affidavits in the record that showed that nurses were hesitant to call Dr. Boland, but that they continued to do and they continued to treat people anyway. I'm not sure that's evidence of a condition of confinement that would be attributable to the county, but what other evidence do you have of conditions of confinement violations? What other evidence? Yes, sir. The continued use of taking inmates out of the general population and putting them in solitary cells to be watched by jail guards who are not trained either. These jail guards would go by and peek inside and see a person, whether they were breathing or not, and that's all they were looking for pretty much. So what's the form of that evidence? Is that deposition testimony or what? I believe it is, Your Honor, deposition testimony from the Brown case. Wait. We incorporated it in our case. All right. And we have depositions from Nurse Ingram, who basically says that even in the Brown case where the doctor says that he would have done it completely opposite, the supervising nurse, who was also an LVN, said that she did everything correct. Was the Brown incident prior to the incident involving Mr. Henson? Yes, sir. Four months. It was four months before. Before. Very similar circumstances. The court in that case found that Ms. Kroczka definitely was deliberately indifferent to Mr. Brown's needs and entertained the idea that in the Brown case it was obvious or evident to that court that the county was put on notice before. The evidence, you embraced Shepard as the best case. Right. But the evidence presented there was the Department of Justice report saying gross inattention to inmate needs amounting to punishment. Right. Whereas here in the exchange you're saying each of these nurses or detention officers tried. They just weren't either supervised or licensed to recognize respiratory distress. Right. That isn't as acute equating to punishment. Well, actually it was hypertensive emergency. In Shepard it was hypertensive. And in our case. I thought it was COPD. Well, COPD is what she figured out, what she got. But when you get the blood pressure reading of 207 or 106, that's a hypertensive emergency. How many nurses saw him over these days? Four. Four. Okay. Actually three saw him and one was on the telephone when he died. And does the record show that they had Dr. Chapa's release discharge form saying he's got to. . . If they would have called the hospital. . . The record doesn't show that they were disregarding a release form that said get him back to the emergency room if he can't breathe. Right. Okay. Do you have anything to say in your two minutes on Dr. Boland? Dr. Boland is the policymaker for the medical care of inmates in jail. In his contract it even says in some part in there that when he consults with the sheriff over a situation he has that the sheriff cannot veto the medical decision of the doctor. When it comes down to providing medical care in jail, Dr. Boland has all the say. He cannot be overruled or turned over. I would refer the court to Zarno v. City of Wichita Files. In that case you had a chief of police who actually had a final policymaker above him, the city manager. But the court in that case found that because the police chief has different duties and things that he was the final say with regards to police procedure. And then here we're talking about medical procedures, not police procedures. Even if Dr. Boland is the policymaker and the evidence had both Sheriff Callahan and Dr. Boland sort of disputing that they had any authority over the nurses, we still need, do we not, a constitutional violation, not conditions of confinement, but a constitutional violation because Dr. Boland would be entitled to qualified immunity unless there were one. And we have held definitively for this case that there was no constitutional violation by Nurse Kroshka. So where are we on finding Dr. Boland responsible when there was no constitutional violation by the nurse or anyone else who has been so determined in this case? Dr. Boland was contracted to hold three sick calls a week in a jail. And he testified in his deposition that he knows that there could be anywhere from 7 to 30 people that needed his care. And certainly that would include Mr. Henson because he was put on a doctor's call on the first day he was there rather than send him to the hospital, so they put him on a doctor's call and he wasn't seen. The county had an obligation to transfer him back to the county jail for an examination, and they dropped the ball and didn't do that. Well, Mr. Bunch, I think I understand your argument. You'll have more time to illuminate us in a few minutes. Thank you, Your Honor. Thank you. Mr. Davis. Your Honors, I appreciate the opportunity to be heard on this matter. I believe that Mr. Bunch has essentially stipulated that he's trying to present this case as a conditions of confinement case. Stipulated in his previous argument this morning? Yes, sir. Or you mean otherwise? That's what I perceived to be stipulated this morning in his argument. If I'm wrong, I can address both, but I believe that he's essentially without having an independent actor intervening, and I don't think he is in this case, and I think the only thing that he can claim is a conditions of confinement case. But I will point out to the court that for practical considerations, both of those cases are considered to be essentially analyzed the same way under a deliberate indifference standard. Let me make sure I understand. Which two cases? Yes, Your Honor. Conditions of confinement case. Oh, you mean just generally the two claims are analyzed in the same way? I thought you meant two precedents came up in the same analysis. No, Your Honor. You're exactly right, and thank you. The two claims are analyzed in the same manner. It's a functional equivalent. Deliberate indifference is a functional equivalent to a conditions of confinement case analysis. A functional equivalent, but it is imputed, it is presumed in a conditions of confinement that you have the kind of intent. Isn't that not correct? Isn't that what we held in the in-bank decision in Hare? Yes, Your Honor. For pretrial detainees, there is that presumption. For parolees, you lose that presumption, but we're talking about a pretrial detainee in this case. And if you're looking at the standard relating to conditions of confinement, it's clear, very clear, that they have to show much more than isolated instances of inadequate or negligent medical care. They have to show acts indicative of a system-wide problem that has been extended or pervasive. It's not good enough to point to one previous episode. They've got to point to something that is so pervasive that it creates an actual condition of confinement. And if we look at the cases where this circuit has held such a condition to exist, we can look at Duval v. Dallas County, and we can look at Shepherd v. Dallas County. In Duval v. Dallas County, 20% of the inmates in the Dallas County Jail had MSAR. They had severe staph infections that could not be cured with antibiotics. They had 20 cases per month, and it was found that they were doing absolutely nothing to attempt to treat the conditions or clean the bedding. In Shepherd, Your Honors, it was an even worse situation. The testimony was, when the U.S. government came in to investigate, the testimony from all the medical staff was that at least 50% of the inmate medications were not being given out to the inmates. Those are the types of cases that create a conditions case, a pervasive practice within a facility of not providing basic human needs. What about a policy that would be pervasive, such as having nurses in the jail that aren't qualified, and I'm just for the sake of the question, that aren't qualified to be engaged in the type of practices they're performing? I'm glad you brought that up, Your Honor, because there's a long line of cases in Fifth Circuit history that have essentially held that internal policies, state policies, state rules, don't apply when you're analyzing a case in a constitutional content. The only thing that applies is what the Constitution says the care should be. If the care for a pretrial detainee is that they have to receive reasonable medical care, then so be it. That's the standard. But it doesn't take any state statutes or state standards and place those standards over the federal standards. It doesn't change the deliberate indifference standards. There's jails all over the nation that have no LVNs and no one trained to provide medical care, and they're not required to. But they have to treat inmates in a reasonable manner and not be deliberately indifferent to their serious needs. Where are we going to find that in the record, what you just said? In terms of my analysis of the law? Yes, sir. I would have to go through here and show you, Your Honor, but essentially it's the section relating to deliberate indifference. But the question— I'm asking, the question is evidence in the summary judgment record to support what you've just said. Your Honor, I don't think there's any evidence in the summary judgment record other than the fact that there were LVNs on duty. In terms of specific facts, I don't think there's anything along those lines. I thought it was undisputed that Dr. Boland said the sheriff's responsible for supervising him, and then Sheriff Callahan said, no, he's responsible. I think it's dual supervision, and I think you find that in a lot of jail contexts. The sheriff is responsible for the supervision of the nurses on disciplinary matters, on showing up for work, on keeping track of time. Dr. Boland's responsible for how they conduct their medical activities. Counsel, you laid out a reasonable division of responsibility, but neither sheriff nor doctor seemed to know that from their testimony. To me, Shepard is not a perfect fit. Shepard had Department of Justice all over the Dallas County Jail, had other inquiries, but some of the problems in Shepard are at least analogous to what is going on here. You highlighted that 50% or more of the prescriptions rarely were undelivered, but there's a lot more there, such as the jail has no capacity to diagnose illnesses at intake, no policy or procedure for how inmates who come to the jail, how they receive their medication. Dysfunction in the medical care is one label that was put. What concerns me about this case, and has from my introduction to this case years ago, is that there didn't seem to be anybody in charge of medical care at Wichita County Jail. That at least makes it somewhat analogous to Shepard. I don't know about Duvall, but at least Shepard. When you're looking at conditions of confinement and assuming intent, that is the equivalent of deliberate indifference, where was there somebody working to provide, through supervision or otherwise, providing medical care that would be consistent with the needs of the inmates? Particularly as it applies to the needs of this inmate, Your Honor, which is what I really think we're talking about, there's got to be an unconstitutional violation relating to this inmate. I believe the court has found that there has not been a constitutional violation specifically relating to this inmate. That's because we found no deliberate indifference as to Nurse Kroshka, which is not an issue in a conditions of confinement case that is imputed. I'm not quite sure how that works out, but that is what the law says and what we held in bank. So I don't think the fact that Nurse Kroshka was found not to be deliberate indifference is even particularly relevant. Well, Your Honor, I think you have to look at the . . . First you have to look at whether or not there's a pervasive issue here. You're looking at two cases, nothing more, and two cases that are extremely diverse from each other. In the Brown case, Mr. Brown had varices in his throat that's caused from the use of methamphetamine. He had a bleed and he bled out. This gentleman came into the jail with two prescriptions from the outside world, which he was given, an albuterol inhaler, and he was prescribed with breathing treatments, and he was given those medications. So he came in from the outside world, had never filled those prescriptions, but started receiving them while in the jail. He was taken out of the smoke-filled multipurpose or the smoke-filled floor of the jail and placed in isolation so that the secondary smoke wouldn't harm him, and then he was watched every 15 minutes. The judgment by the magistrate judge, which is also found in his opinion, provides that Wichita County and Dr. Daniel Boland are entitled to qualified immunity. Well, qualified immunity applies only to individuals. Do we need to remand this to the magistrate judge to reconsider his ruling since apparently he thought he was ruling on qualified immunity for the county? I don't think so, Your Honor. I think it's a misstatement by the magistrate judge. I feel sure that Judge Stickney knows the difference between sovereign immunity and qualified immunity, and I don't think that there's any reason to belabor this case. Wait. You're not saying the county is entitled to sovereign immunity, are you? Well, I believe that to a very large extent the county is entitled to sovereign immunity, Your Honor. They have to prove Menil and its progeny to get them passed. Certainly they do. Yes, Your Honor. But he says qualified immunity. Yes, sir, and I think that if anything he meant it was a misstatement or something along those lines. Well, he says in order to overcome the qualified immunity defense in episodic act cases, plaintiffs must prove the nurse acted or failed to act with deliberate indifference to Henson's needs. The Fifth Circuit conclusion that the nurse did not act with deliberate indifference forecloses plaintiff's claims. Wichita County is thus entitled to qualified immunity, but he never talks about conditions of confinement. Your Honor, I really don't believe conditions of confinement was raised in the court below. We proceeded throughout this case as an episodic act case. Conditions of confinement is something that came up after the pleadings and after the briefings and after the hearings below. All right, counsel. Thank you. Thank you. May it please the court. David Walsh on behalf of Dr. Boland. With regard to Dr. Boland, he's been under contract with the jail since the mid-90s. I think the contract was signed in January of 1995, so about 10 years before this incident. And then it was renewed or revised with a new contract in 1998. And the reason I bring that up is because this system that they're complaining about has been in place for a decade and then went on apparently in place for some years afterwards to get the subsequent complaints. But we have seven complaints in 10 or 15 years, only one of which occurred before the incident with Mr. Henson. And that's why there's nothing in the history of the jail that suggests there's been a problem that needs fixing. So what put Dr. Boland on notice? That the nurses were acting outside their scope. Everything seemed to work fine until then. Nobody points to any other problems except for Jason Brown. And then what signals that there's a problem that they're not trained or they're not supervised or they're intimidated? Very little. The two affidavits which relate to nurses that stopped in 1999 and 2001, according to their testimony, that they were intimidated, they both said we wanted to do something. He said no, and he was grouchy. He said no, and we went ahead and did it anyway. The inmates got the care that they needed. His argument here has been less this notion of intimidation and more the notion that they simply had no license to administer medical care to someone in an acute or chronic condition. And that's just wrong because the Nurse Practice Act doesn't make them complete total wilting flowers. They have a list of standing orders to pick treatments from, but that doesn't mean that they can't follow their standing order. It's not them that's entering the standing order. It's Dr. Boland that entered the standing order. If you have cough with congestion, give this. If you have this with that, give something else.  The jail medical plan says if you can't breathe, send them to the hospital. But more importantly, even the plaintiff's experts, if you go back and look at the expert reports, these nurses are so idiotic almost that everybody should realize that. The nursing opinion is almost everybody coming out of any nursing school should know better to deal with this patient than like they did, which raises back to the point of not that an LVN is incapable of dealing with a patient with COPD that is having a crisis. It's that these particular nurses didn't do their jobs appropriately. But what notice is Dr. Boland going to have of this problem without there being a problem in the past? And that's ultimately the problem, which gets back to whether it's a conditions of confinement or episodic act case. And it's got to be an episodic act case because there's the intervening actor who's allegedly screwing up. And if you go back and look at what has happened in this case, all of the other individuals in the case have either been dismissed or got qualified immunity, and it was not appealed. One of the things Mr. Bunch said about Dr. Boland just a few minutes ago when I raised that Nurse Kroshko was found not to be deliberately indifferent, is he seemed to be arguing that Dr. Boland was deliberately indifferent by not being there. And I don't know to what extent that is the way it was presented in the district court, but what about that argument? It's one thing to say that there has to be a constitutional violation, and so far there's not been one found, but due to deliberate indifference protection. What about Dr. Boland? Doesn't he have some obligation to show up and deal with, not necessarily, it would have to be dealing with Henson because it's Henson's causation that we're looking at, but what about that argument? The way that was phrased in the trial court was under his contract he's supposed to have three visits at the jail, either two at the jail and one at the annex or vice versa, I don't remember the exact order of which it went down, and that because this day's visit fell on Thanksgiving, he was planning to make it up later and didn't. And so they say he breached his contract. I don't understand how that rises to the level of a constitutional problem. Even if the contract's in place to prevent constitutional problems, mere violation of the contract doesn't necessarily rise to a constitutional level. That's this court's recent opinion in Doe v. Roberts, in which we cited in our brief, where the ICE people contracted with some people and they didn't have a female attendant supervising and then some male attendant of a prison transfer sexually assaulted some lady. Well, again, the breach of contract doesn't necessarily form the basis of a constitutional violation. Second, in Texas state law, at least whether that would amount to be a medical malpractice claim, is seriously in dispute because in Texas, if you violate your own internal policy, that doesn't prove you are negligent in and of itself because you could set the bar way above the negligence line so that falling below your own bar doesn't mean you're negligent. And we cite a couple of cases, FFE v. Fulgham from the Supreme Court of Texas on that, plus this court's opinion in Quijano that kind of make that point, which gets back to the point of merely delaying one of these visits doesn't show that you even committed malpractice, let alone rise to the level of serious neglect to be a constitutional violation. And then with regard to Judge Southwick's specific question of isn't that deliberate indifference, it's not because he doesn't know what is on the list of people to be seen that day, whether it's somebody that's in a life or death emergency or whether it's somebody who just has a repeat cold, which the standing orders say if it doesn't work enough, put them on the call list, I'll see them at the call list. And so with regard to whether he's going to be dealing with somebody that's got a serious medical need that's going to be problematic, that Dr. Boland doesn't know because nobody even ever told him that Mr. Hinson was in the jail and needed medical care. And so when you add those kind of three things together, the breach of contract that they allege in the trial court doesn't rise to that level of deliberate indifference and certainly in my mind wasn't argued as a level of deliberate indifference because he missed one day of a jail visit on one week when it was a holiday, planning to make it up later on. And then nobody ever told him that there was a problem with this patient. If they pick up the phone, if the individuals pick up the phone and say Jason or Mr. Hinson is having a particular problem, he can give an order, he can tell them to go to the hospital, he could tell them he could prescribe different medication, he could do a whole variety of things if he's aware of the problem and he can't be deliberately indifferent when he's not aware of the problem. You made some reference a while back and I wanted to ask you about it, about these idiotic statements about nurses and what are you talking about? Sure. The expert reports essentially characterize the nurses at the jail as idiots. I probably didn't phrase that as artfully as I want to and I don't think they go to that phrase but the nursing opinion is basically any nurse who's graduated from nursing school should know how to deal with this man with COPD, which is how I don't understand why the LVN issue is at play. You're saying their expert, Jacqueline Moore, said that LVN should have been able to handle this? Any nurse should be able to handle this. So that's your argument that this can only be an episodic? That's one reason why in this particular setting because it's so obvious. She certainly says these nurses shouldn't be handling these things at the jail but she goes on to say any nurse graduating from nursing school should know, which proves our point that even these nurses should know, which if you go back and read the statute, the statute does not say the LVN nurse can only take, and the regulation too, can only take data and go talk to the doctor. That's not all what it says because under the section above the one they cite to, all nurses have an obligation to assess the patient and evaluate whether they're competent to handle that care. And then if you go specifically to LVN nurses, that's true also. They've got to make a nursing assessment, which they did, rightly or wrongly, they still made a nursing assessment and they assessed whether it was within their capability. The fact that it didn't turn out well because they made a right or wrong decision doesn't mean that Dr. Boland was somehow negligent because they still have to accept the delegation from him under the standing order or whatever to decide that that's within their scope of practice. It doesn't mean that they're not or they're not capable of, even if they screw up. Is there any evidence of Dr. Boland's age in the record? Dr. Boland's age? I do not know that and I don't think it's in the record. I do know that it's not. Is there any evidence in the record how long he's been practicing medicine? There is not. I do not believe it. It might be in the contract, but I didn't read any of the wherefore parts of the contract, but I don't think it is. But my impression is that Dr. Boland is not retired on the one hand and he's also not a brand-new doctor. So I kind of get the impression that he's in his 40s or 50s when this contract is entered. How long has he been the doctor for the jail? Since 1995? Since 1995, and I do know that at least somewhere along the way during the course of this litigation with all these various people, he's no longer the jail physician, and I think that was roughly 15 years after 1995, but I'm not positive about that, so 2010 or so would be my guess. But again, I'm not positive about that. All right. Thank you. Judges, I gave you a citation of 116-2. That's actually found at 1672 of the record. That 116-2, is that a document number found at 1672? Yeah, it's on page 1672 in the record. Okay, page 1672. Yeah, there we laundry list 17 items that we believe are conditions of confinement. You know, it's one thing to laundry list, it's another to have evidence. You're saying you've got evidence in the record. If we both talk, we're not going to understand what we're saying. So you're telling us that we will look in this summary judgment record and for every item on your laundry list you've got evidence to support it. Yes, sir. All right. Seven and a half hours a week, according to Nurse Ingram, is how long Boland spends at the jailhouse. And five of those were at the annex, and two and a half were at the downtown jail. Mr. Henson was at the annex, and he was scheduled to see the doctor from the day he got in there. He was supposed to see him at downtown jail. He missed that because he got moved to the annex. Well, the county is supposed to transfer him over there. They didn't do it. You said 17 and a half hours a week? Seven. Seven. Seven hours a week. Seven and a half hours a week, according to Nurse Ingram's testimony. Does the contract require a specific number of hours, or how does the contract work? The contract doesn't require any specific hours, other than it does say that he will go to the emergency room if he has to. He has to go see that and take care of that inmate at the hospital. And he doesn't get paid additional for that. But if he can't do that, if he misses a sick call day, he has to pay out of his own pocket someone to sit in for the doctor's call because they have a continuing number, anywhere from five to 30 inmates, that need his assistance according to his deposition. But you're not saying there's a 14th Amendment violation, failure to give medical care, unless there is a doctor on the premises? Right. That's not your position? No. Nor is it that some specific number of hours are required? You could have a jail that only had nurses. So what's the rule? When do you hit pervasive condition of confinement if it's the question of physician supervision? Well, his contract calls for him to be there three times a week, and he's there three times a week, except when he decides he doesn't want to go. And then he's supposed to hire someone to come in and sit in his place. And that could be negligence or gross negligence. But I guess I'm asking you, if we look beyond this case, what's the rule you're saying you survive summary judgment unless a jail has a physician what? You have to have a physician to be in charge.  He doesn't want to be. He's got willful ignorance in this case. Two hours after Henson died, he holds a doctor's call less than ten feet from where he died at, and he claims that he didn't know anything about it. That is a communication problem of just plain deliberate indifference. If the sheriff doesn't come to him and say, we had this guy die here two hours ago, what happened? And the doctor can't tell him? Well, the doctor says, I didn't know. He says he didn't know about the Brown case until he got served with papers. I have a problem with what he's saying is true. I don't think he is being truthful. But he is willfully ignorant. He doesn't want to know. He doesn't want to know these things. In the Cameron case, he walks by Cameron's cell, looks inside the door, sees a naked man laying on the floor, and he says, this guy is sick, turns and walks away. He's dead less than three hours later. The Cameron case before or after the Henson? It's after. Right. But what it shows is a continuing custom of Boland's behavior and the nurse's behavior. What authority can you cite that we can look to post-incident episodes to help you prove conditions of confinement? Grandstaff. I think Grandstaff is a case where you had a police shooting and there was some evidence after the police shooting that was brought in. Well, Shepard. Shepard was a case that happened in 2003, and I think the reports, the Justice Department reports, and the other report that the county commission came in in 2005. What about the magistrate judge holding the county is entitled to qualified immunity in its judgment? And in his opinion, it sort of alludes to the test being qualified immunity. They're not entitled to qualified immunity. Well, the county is not entitled to qualified immunity. So I'm saying to you, do we need to remand this for a new hearing on the liability of the county if the magistrate judge was thinking he was testing qualified immunity, which is an easier hurdle to cross? I would remand it, but that's y'all's decision to make. It should be because you're not entitled to qualified immunity. All right, Counselor. Thank you. Thanks to each of you. I think I've seen you all before.